1 | Robert S. Green (State Bar No. 136183)
2 | James Robert Noblin (State Bar No. 114442)
  | Lesley E. Weaver (State Bar No. 191305)
3 | **GREEN & NOBLIN, P.C.**
  | 700 Larkspur Landing Circle, Suite 275
4 | Larkspur, CA  94939
  | Telephone:  (415) 477-6700
5 | Facsimile:  (415) 477-6710
  | Email:  gnecf@classcounsel.com

6 | Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARVEY WEISMAN, | Case No.: |
| Plaintiff, | |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| CHRISTOPHER R. ANZALONE, DOUGLASS GIVEN, EDWARD W. FRYKMAN, MAURO FERRARI, CHARLES P. MCKENNEY, AND MICHAEL S. PERRY | JURY TRIAL DEMANDED |
| Defendants. | |
| and, | |
| ARROWHEAD RESEARCH CORPORATION, | |
| Nominal Defendant. | |

00089852.000.doc

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.    Plaintiff Harvey Weisman, by and through his attorneys, being this action derivatively on behalf of nominal defendant Arrowhead Research Corporation ("Arrowhead" or the "Company").   This Complaint is based upon personal knowledge with  respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by  Arrowhead with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Defendants' public documents, conference calls and press releases; (c) review and analysis of securities  analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the Internet.  This action is brought on behalf of the Company against the members of its Board of Directors ("Board") and/or certain of its executive officers seeking to remedy Defendants' breaches of fiduciary duties and other violations of the law that occurred from August 12, 2014 through October 8, 2014, inclusive (the "Relevant Period").

2.    Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

3.    Arrowhead is a biopharmaceutical company whose main business is developing RNA Interference ("RNAi") therapeutics.   RNAi is a process by which the RNA molecules prevent gene expression and thereby destroys specific micro-RNA ("mRNA") molecules.  Arrowhead's focus is to develop drugs that target the RNAi mechanism that will suppress disease-causing genes.  ARC-520 (or the "Drug") is one of Arrowhead's main products and crucial to its business and operations.

4.    ARC-520 is an RNAi therapeutic that targets the hepatitis B virus. ARC-520 is currently being tested for its effectiveness in using RNAi to halt the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

production of hepatitis B genes, which will reduce the number of infectious hepatitis B particles.

5.     On October 8, 2013, the Company announced the completion of the Phase I study of ARC-520, which tested the drug in non-human primates such as chimpanzees, as well as mice and rats.

6.     On March 24, 2014, the Company announced the commencement of the Phase IIa study on ARC-520, which tested the drug in humans. The Phase IIa study examined the enrolled hepatitis B patients and assigned them randomly to either receive ARC-520, at doses of 1 mg/kg or 2 mg/kg or a placebo.

7.     The measure of effectiveness of the drug is to have a log reduction and duration of reduction of hepatitis B surface antigens ("HBsAG") which measure the presence of hepatitis B in the body.   A log reduction is a mathematical term used to describe the relative number of live microbes eliminated.   One log reduction stands for a ten-fold (one decimal) or 90% reduction in the numbers of viral particles.

8.     In the Phase I study of ARC-520 involving a chimpanzee infected with hepatitis B, the Company indicated that treatment with ARC-520 caused a 0.8 log reduction in HBsAG.

9.     On August 12, 2014, Defendants held a conference call to report on Q3 2014 earnings and the progress of the Phase IIa study. During this call, Defendants, including CEO and Director Christopher Anzalone, and COO Bruce Given, made materially false and misleading statements and/or failed to disclose the true viral reduction level that ARC-520 can induce in humans, suggesting that its viral reduction was similar to the chimpanzee result (0.8 log reduction) and closer to 1 log 25 (90% reduction).   Specifically, Mr. Given stated that "if you double the dose, you substantially more than double the response."

/////

/////

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10.     On October 8, 2014, the Company announced the results of its Phase IIa study, revealing that ARC-520 dosed at 2 mg/kg only induced a 0.3 log reduction in 3 HBsAG – far short of what Defendant previously suggested.

11.     On this news, the Company's stock fell $5.48 per share, or almost 44%, on extraordinary volume from its previous closing price to close at $7.03 per share on October 8, 2014.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2), as Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over each Defendant because each Defendant has sufficient minimum contacts with this forum so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(a) because:  (1) one or more defendants either reside in, or maintain executive offices in this District;  (2)  a substantial part of the conduct complained of herein occurred in this District, including the defendants' primary participation in the wrongful acts detailed herein;  and (3) Defendants have received substantial compensation in this district by conducting business herein and by engaging in numerous activities that have had an effect in this District.

/////
/////

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**PARTIES**

15.     Plaintiff Harvey Weisman is a resident of Pikesville, Maryland.  Mr. Weisman is a current shareholder of the Company and has been a shareholder of the Company throughout the Relevant Period.  He currently owns 300 shares of the Company and first purchased on June 19, 2014.  A copy of his verification of the complaint is attached hereto.

16.     Nominal Defendant Arrowhead is a Delaware Corporation headquartered in Pasadena, California.

17.     During the Relevant Period, Arrowhead's common stock was actively traded on the NASDAQ Global Select under the ticker symbol "ARWR."

18.     Defendant Christopher R. Anzalone ("Anzalone"), at all relevant times herein, was the Company's President and CEO, and a Director since December 1, 2007.  In FY 2013, Anzalone received compensation of $1,043,201.

19.     In addition to his position as Arrowhead's Chief Executive and Director, Anzalone is a director of Arrowhead's wholly-owned subsidiary, Arrowhead Madison Inc., majority-owned subsidiaries, Calando Pharmaceuticals, Inc., Ablaris Therapeutics, Inc., and Tego Biosciences Corporation and minority investment, Leonardo Biosystems, Inc.

20.     Arrowhead's Head of Investor Relations is Vice President Vincent Anzalone ("V. Anzalone"), who, prior to his executive position at Arrowhead, was a chartered financial analyst.

21.     In the August 12, 2014, conference call at issue, Defendant CEO Anzalone said as follows:

> "Thomas Wei (Jefferies): ...so you are talking about kind of what would have been predicted if you have been able to follow that chimp out at 2 mg per kg for longer than 14 days. What you are seeing is better than that? ...
>
> Dr. Christopher Anzalone (President and CEO): I think it's fair to say that yes."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

00089852.000.doc

22.     Defendant Douglass Given ("D. Given") has been a Director of the Company since November, 2010.

23.     D. Given's brother, Bruce Given ("B. Given"), is the Chief Operating Officer of Arrowhead.   B. Given, in turn, is also a director of Arrowhead's subsidiary, Calando Pharmaceuticals, Inc., and is CEO of Leonardo Biosystems, Inc., in which Arrowhead holds a minority equity interest.

24.     As an inducement to his entering into employment with the Company, B. Given was awarded an "inducement" option. The option entitles B. Given to purchase, outside of the Company's stockholder approved equity incentive plans, an aggregate of up to 300,000 shares of the Company's common stock at an exercise price per share equal to the last reported closing price of the Company's common stock on the date of grant. The option vests and becomes exercisable over a period of four years from the date of grant.

25.     D. Given sold 2,000 shares of the company's stock in a transaction dated Friday, September 26, 2014, two weeks before the truth about ARC-520 was revealed on October 8, 2014.   D. Given's stock was sold at an average price of $15.24, for a total transaction of $30,480.   After the sale, D. Given owns 20,000 shares of the company's stock, valued at approximately $304,800.

26.     On the website of one of his ventures, D. Given boasts:

> "I knew Arrowhead Research (ARWR) was a gem the moment I saw it. I came across the company when I was looking for a therapeutic iRNA investment.  Arrowhead was the first to reach human trials with iRNA therapeutics and publish, yet issues around drug delivery loomed large.

> The CEO and I worked so well together that I joined the board to help him identify and acquire an outstanding delivery platform from Roche. We then guided the company from research into clinical development, and raised $220M of equity in the public capital markets. In just one year, Arrowhead's valuation rose from $30M to $800M+, and the company is advancing clinical trials in hepatitis B, leading the industry in meeting this significant public health need."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27.     Edward W. Frykman ("Frykman") has been a director of the Company since January 2004.  Mr. Frykman is chair of the Audit Committee, a member of compensation committee, and a member of the nomination committee.  Frykman has been an Account Executive with Crowell, Weedon & Co. since 1992, and previously managed the Los Angeles Retail Office of E.F. Hutton.

28.     In addition to serving on Arrowhead's Board, Frykman is a director of Arrowhead's majority-owned subsidiaries Calando Pharmaceuticals, Inc., Ablaris Therapeutics, Inc., and Tego Biosciences Corporation.  Mr. Frykman sold $50,000 of Arrowhead shares in February, 2014.

29.     Dr. Mauro Ferrari ("Ferrari") was appointed to the Arrowhead Board of Directors in 2010.   He is a member of the nomination and compensation committees.  In addition to serving on the Board of Arrowhead, Ferrari is also a director of Leonardo Biosystems, Inc., in which Arrowhead holds a minority equity interest, and which Ferrari helped found.

30.     Charles P. McKenney ("McKenney") has been a director of the Company since April 2004.  He is a member of all three committees – audit, compensation and nomination.  In addition to his service on Arrowhead's Board, Mr. McKenney is a director of Arrowhead's majority-owned subsidiaries Calando Pharmaceuticals, Inc., Ablaris Therapeutics, Inc., and Tego Biosciences Corporation.

31.     On June 9, 2014, McKenney sold shares of Arrowhead for approximately $315,000.  Four months later, McKenney sold 2,500 shares of Arrowhead Research Corp stock on the open market in a transaction that occurred on Wednesday, October 1, 2014.   The stock was sold at an average price of $14.70, for a total transaction of $36,750. Following the completion of the sale, McKenney owns 17,220 shares of the company's stock, valued at

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

approximately $253,134. The truth was revealed about ARC-520 a week after McKenney's sale on October 8, 2014.

32. Dr. Michael S. Perry ("Perry") joined Arrowhead's Board of Directors in December 2011. He is chair of the nomination committee and chair of the compensation committee, and he serves on the audit committee. Dr. Perry has filed over 50 investigational new drug applications, and over 30 new drug applications and biologic license applications, for a number of companies across the globe. Defendants Anzalone, D. Given, Frykman, Ferrari, McKenney, and Perry are collectively referred to hereinafter as the "Individual Defendants."

33. By reason of their positions as officers and directors of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

34. Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and directors of a publicly held company, the Individual Defendants had a duty to disseminate promptly accurate and truthful information concerning the Company's revenue, margins, operations, performance, management, projections, and forecasts, so that the market price of the Company's stock would be based on truthful and accurate information.

35. The Individual Defendants, because of their positions of control and authority as directors, were able to, and did, directly and indirectly, exercise

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their executive, managerial, and directorial positions within the Company, each of the Individual Defendants had access to adverse, non-public information about the Company's financial condition and operations, and the misrepresentations made relevant thereto.

36.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

37.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the Defendants were required to, among other things:

a.     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.     neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.     establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.     neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

/////

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

38.     Each Individual Defendant, by virtue of his position as a director, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

39.     The Individual Defendants breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or officers of the Company from taking such illegal

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

actions.  In addition, the Company is now the subject of class action litigation alleging violation of federal securities laws, which necessitates the Company to incur excess costs arising from the Individual Defendants' wrongful course of conduct.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and assisted each other in breach of their respective duties.

41.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

      a.     Conceal the fact that the Company was improperly misrepresenting its financial results in order to allow defendants to artificially inflate the price of the Company's shares;

      b.     Maintain the Individual Defendants' executive and directorial positions at the Company and related Companies and the profits, power, and prestige that the Individual Defendants enjoyed as a result of these positions; and

      c.     Deceive the investing public, including shareholders of the Company, regarding the Individual Defendants' management of the Company's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financial condition that had been misrepresented by the Individual Defendants throughout the Relevant Period.

42.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

43.     The Individual Defendants engaged in a conspiracy, common enterprise, and common course of conduct during the Relevant Period.  During this time, the Individual Defendants caused the Company to conceal material facts, misrepresent its financial results, and violate applicable laws.

44.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things: (1) to disguise the Individual Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment; (2) to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and (3) to artificially inflate the price of the Company's stock so that the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

45.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise, and common course of conduct alleged herein.

46.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs alleged herein.  In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.

**RELEVANT SUBSTANTIVE ALLEGATIONS**

47.     The Relevant Period begins on August 12, 2014 when the Company issued a press release providing an update on the Phase IIa study of ARC-520,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

which was also filed on Form 8-K with the SEC.  Defendant Anzalone, with company insiders V. Anzalone and B. Givens, was responsible for issuing the press release, and the three Director members of the audit committee, Defendants Frykman, McKenney and Perry, were responsible for ensuring its accuracy.  The press release touted that the ARC-520 response in human hepatitis B patients was similar to the chimpanzee results, stating in relevant part:

ARC-520 Phase 2a Study Update

- Completed dosing of 1 mg/kg and 2 mg/kg does cohorts

- ***Initial blinded data suggest that the magnitude of HBsAg knockdown is similar to non-human primate studies, including the chronically infected chimpanzee reported on previously***

- ***Duration of knockdown appears to be substantially more sustained than in non-human primates, with patients in the 2 mg/kg group still demonstrating substantial knockdown after 8 weeks, which is the most recent time point available.***

- HBsAg levels appear to continue to decline in a number of patients at the 8 week time point in the 2 mg/kg group

- Based on initial review, dosing less frequent than once monthly will be explored in Phase 2b

- ARC-520 continues to be well tolerated, with no dropouts or serious adverse events reported

- The overall rate of AEs has been lower in the Phase 2a than in the Phase 1 normal volunteer study and safety labs continue to show no indication of end organ toxicity

- Enrolled and dosed additional subjects at 3 mg/kg in the still open normal volunteer study and the dose performed well, without detected differences from safety and tolerability results at the other doses. Overall AEs do not appear to be increasing in frequency or severity with dose

- Received IRB and DSMB approvals to proceed and began enrolling an additional dose cohort at 3 mg/kg in the Phase 2a patient study

(emphasis added)

48.  Also on August 12, 2014, Arrowhead held a conference call to discuss the Q3 2004 earnings results and the progress of the clinical data for the Phase IIa study of ARC-520 collected at that point.  Defendant Anzalone

participated on the call, as well as Defendant D. Given's brother, B. Given. Both Anzalone and B. Given affirmatively misrepresented the results of the PhaseIIa study, as detailed below.

49. During the conference call, Defendant Anzalone made the following initial remarks concerning the PhaseIIa study, which touted the reduction ability of I ARC-520 in humans:

> As you know, earlier this year we initiated a dose finding Phase 2a study designed to inform a multi-dose Phase 2b study. *Our two primary goals were to identify a dose that, A, induces a 90% reduction of circulating s-antigen after a single administration and B, provides durable enough knockdown to enable once per month dosing.* Given our studies in multiple animal models, we were quite confident that we could achieve this, but just did not know what that dose would be in humans.
>
> Our interim results have been extremely exciting. We completed dosing of 1 and 2 milligrams per kilogram in June and those studies still blinded, several important conclusions may already be drawn. *We are seeing clear knockdown in both groups and duration of that knockdown has been substantially longer than we expected.*
>
> *We currently have data from the 2 milligrams per kilogram cohort as far out as two months after dosing and in these patients we perceive -- and in the patients we perceive as having received ARC-520, we still see substantial knockdown at this time point.*

50. On the same call, Chief Operating Officer B. Given made the following remarks expounding on the results and suggesting that the ARC-520 response in human hepatitis B patients was similar to the chimpanzee results:

> We have surface antigen data for all patients into 2 mg per kg dose group through six weeks and for five of eight patients we have data through eight weeks.
>
> Again with the caveat that the data is still blinded we believe the knockdown is clearly deeper in this group versus 1 mg per kg and at eight weeks the patients we perceive having received active drug so surprisingly large reductions in surface antigen.
>
> *Overall, duration of knockdown appears to be substantially more sustained in humans compared to the non-human primates we have studied at the same doses. For the depth of knockdown appears to be similar in magnitude with what we see in non-human primates of same doses, including the HBV infected chimpanzee presented at AASLD last year.*

-13-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*****

So how should we think about these results? ***The dose range for knockdown in humans appears to be similar to that seen in nonhuman primates, including the previously reported HBV infected chimpanzee.***

(emphasis added)

51.     In addition to these statements, B. Given affirmatively stated the following:

> "If you double the dose, you substantially more than double the response."

52.     With regard to the ability of ARC-520 to achieve higher than a 0.8 log reduction, Defendant Anzalone had the following exchange with analyst Michael Yee of RBC Capital Markets expressing his confidence in achieving such reduction level:

Michael Yee - RBC Capital Markets:

Yeah. Hi. Good afternoon. Thanks guys. A couple of questions, first on your ongoing Phase 2a study. You should have qualified 1 mg and 2 mg curves, ***people are implying that 2 mgs is around 0.8 log reduction like the animal study. But what is your confidence that 3mgs is going to be greater than 0.8.*** Are you just comparing that to the current time point and the drop you've seen in the time point in the 2 mgs. ***How confident are you that, that will be greater than a 1 mg -- excuse me, 1 log?***

And then going forward, since we're trying to ultimately get functional here in the Phase 2b study, how confident are you in a functional cure if you're not above 1 log. And how many doses will you get and what time points are you looking at your -- to actually look at the functional cure?

Dr. Christopher Anzalone - President and CEO:

Sure, I'll take a crack and I'll hand it over to Bruce as well. ***Regarding our confidence level in achieving the log knockdown with 3 mgs/kg, we feel pretty good about that. What we saw in one 2 mgs/kg is that the depths of knockdown seems to track reasonably well with non-human primate models.*** But of course the durability of the fact is, it's substantially longer. And so that that gives us -- that gives us good confidence that 3 mgs/kg will give us good deep knockdown.

-14-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*****

(emphasis added)

"Thomas Wei (Jefferies): ...so you are talking about kind of what would have been predicted if you have been able to follow that chimp out at 2 mg per kg for longer than 14 days. What you are seeing is better than that? ...

Dr. Christopher Anzalone (President and CEO): I think it's fair to say that yes."

53.     Defendant Anzalone also had the following exchange with analyst Alethia Young of Deutsche Bank expressing his confidence in ARC-520 achieving a 1-log reduction:

Alethia Young - Deutsche Bank:

Great, thanks for taking my question, and congrats on the progress. I just wanted to ask about the 1 log theory again. *Do you still stand by the 1 log knockdown, if you're seeing a longer duration of response?* And then the second question is, run us through like why you believe 1 log is irrelevant (indiscernible) time point period right now, when you're basically at maybe 0.8, 0.7 right now and then I have one quick follow-up.

Dr. Christopher Anzalone - President and CEO:

Sure. It's good question. Thanks very much Alethia. We think that that is an aggressive bogie and it is not clear to what we actually need to reach that level of knockdown. Having said that we think that *we can certainly get there so we're more comfortable if we have it.* The reason that we have, we have stuck to that bogie, is that the only thing that gives any kind of (indiscernible) semi reliable functional cures is interferon. After a year of interferon, about 10% of patients will reach a functional cure and all those patients who do get to that functional cure will see about half a log reduction in s-antigen in around 12 weeks and around one log after 24 weeks.

*****

(emphasis added)

54.     These statements above were materially false and misleading when made because Defendants knew that the data from the Phase IIa study of ARC-520 did not support their assertion that ARC-520 would induce such reduction levels of HBsAG in humans.

/////

/////

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

00089852.000.doc

## THE TRUTH EMERGES

55.     On October 8, 2014, Arrowhead issued a press release stating that the Company was presenting the data for its Phase IIa study on ARC-520 at the American Association for the Study of Liver Disease ("AASLD") meeting to be held on November 7-11, 2014.

56.     Along with this announcement, Arrowhead published a late-breaking abstract for the AASLD Meeting. The abstract revealed that there was a 39% reduction of the hepatitis B's HBsAG when a 1 mg/kg dose was administers and a 51% reduction of HBsAG when a 2 mg/kg dose was administered.

57.     The 51% of HBsAG for the 2 mg/kg dose of ARC-520 equates to only a 0.3-log reduction – falling far short of the near 1-log reduction Defendants had previously suggested, which would have been near 90%.

58.     On that same day, TheStreet.com published an article detailing the Company's disappointing results, which states:

Arrowhead Research Sinks on Disappointing Hepatitis B Drug Data
Adam Feuerstein
10/08/14 – 10:38 AM EDT

Arrowhead Research (ARWR) shares were sliding hard on disappointing data from its experimental hepatitis B therapy ARC-520, released at 10 a.m. EST.

**In an ongoing phase II study, ARC-520 dosed at 2 mg/kg induced a 0.3 log reduction in HBsAG, which is a measure of the presence of hepatitis B virus in the body. The observed treatment effect for ARC-520 at this dose is much lower than investors expected. When Arrowhead first announced results from this study in August, the company didn't provide specific numbers but hinted that the viral reduction was closer to (but not quite) 1 log. A 0.3-log reduction is nowhere close to 1-log reduction, which explains why Arrowhead stock is selling off.**

Arrowhead shares were down 30% to $8.80.

The specific data on ARC-520 disclosed this morning was contained in a late-breaker abstract for the American Association for the Study of Liver Disease (AASLD) annual meeting, which is being held in November.

-16-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The phase II study of ARC-520 in hepatitis B patients is ongoing and Arrowhead is exploring higher doses of the drug, hoping to see a more robust effect. But results from higher doses of ARC-520 have not yet been announced.

Here is the nut graph from the ARC-520 AASLD late-breaker abstract which caused Arrowhead shares to sink:

> ARC-520 activity is assessed by measuring percent change of quantitative HBsAg decline from baseline. For patients receiving ARC-520 in cohort 1, mean nadir HBsAg was - 39% (range - 22 to -57) with a mean change on day 85 of - 31% (range -14 to -39). For patients receiving ARC-520 in cohort 2, mean nadir HBsAg was - 51% (range -46 to -59) with a mean change on day 85 of -22% (range -7 to -40). For cohort 2, the percent reduction in HBsAg was statistically significant vs placebo for Days 3 through 43 post dose. This is the first time that a reduction in HBsAg mediated through RNA interference has been shown in chronic HBV patients.

There is a formula to convert percent change in quantitative HBsAg decline from baseline into a log reduction. The 51% reduction disclosed in the abstract for the 2 mg/kg dose of ARC-520 equates to a 0.3-log reduction.

(emphasis added)

59.     Later that same day, TheStreet.com published another article further commenting on the Company's disappointing results, which states in relevant parts:

> Blame Arrowhead Management Entirely for Today's Epic Collapse
> Adam Feuerstein
> 10/08/14 – 3:52 PM EST
>
> Lay all the blame for Arrowhead Research's (ARWR) spectacular hepatitis B implosion today at the feet of CEO Chris Anzalone and the rest of the company's management team.
>
> All CEOs of publicly traded companies must manage investor expectations. For CEOs of early, development-stage biotech companies like Arrowhead, making sure Wall Street isn't delivered a nasty surprise is absolutely crucial. Credibility lost is very difficult to retrieve. Yet for some inexplicable reason, Anzalone totally botched the job.
>
> **For months, Anzalone and his team knew ARC-520 dosed at 1mg/kg and 2 mg/kg yielded 0.2-log and 0.3-log reductions in hepatitis B viral load. Publicly and privately,**

-17-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2

**however, Arrowhead executives led investors to believe that ARC-520 was more potent, achieving viral load reductions in the range of 0.7 log or higher.**

3
4
5

Arrowhead could have been honest with investors about ARC-520's mediocre performance at the two lowest doses. The company could have told investors, "We're not where we want to be with ARC-520 dosing and viral load reductions yet, but we think we can get there soon at higher doses and here's why."

6
7
8
9

If Arrowhead had played fair and conservatively earlier this year, perhaps the stock price might not have reached $26 in March like it did. Maybe the company's valuation bump would have been more modest. But I'm also more certain Arrowhead wouldn't trade at a year low like it is now because investors were misled and are now pissed off.

10
11

I asked Arrowhead management to explain their actions but received no response.
                              *****

12

(emphasis added)

13
14
15
16
17
18

60.    Following this negative news, on that same day - October 8, 2014 - the Company's stock fell to as low as $5.48 per share on one-day volume of 54.78 million shares, closing at $7.03.  On October 7, 2014, just one day prior, the stock had opened at $13.42 and closed at $12.51, reaching a high of $13.50, on volume of just 3 million shares.  Thus, the news devastated the stock, causing a one day drop of 44%.  Today the stock trades at $5.72.

19

**DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

20
21
22
23
24
25
26
27

61.    Plaintiff brings this action derivatively in the right, and for the benefit, of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  The Company is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

28

/////

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

00089852.000.doc

62.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

63.     Plaintiff is a current owner of the Company's common stock and has been the owner of the Company's common stock during the Relevant Period.

64.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Company's Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

65.     The Individual Defendants lack both the independence and disinterestedness required to impartially consider a demand by Plaintiff. Individual Defendants have received substantial monetary compensation and other benefits from the Company.   They also maintain certain familial relationships with other Company employees, as well as other relationships with Company subsidiaries and investments.  Accordingly, they cannot be considered independent.

66.     Of the five board members, Anzalone is an insider, and D. Given and McKenney sold shares after the false statements and before the truth was revealed.   As such, three of the five board members lack independence and demand is futile.

67.     Defendant Anzalone is the President and CEO of the Company in addition to sitting on the Board of Directors.  In 2013, Anzalone earned a salary of $503,808, augmented by a cash bonus of $75,000 and additional $463,393 in option awards, for total compensation valued at $1,043,201.  In 2012, Anzalone's total compensation was valued at $1,484,685.   As of September 30, 2013, Anzalone held 422,461 shares in the company.   Accordingly, Anzalone has a vested interest in making sure the price of stock is as high as possible.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

68.     Furthermore, Anzalone's position on the Board and as President and CEO gives him a certain level of prestige in the business community.  As a result of his position with the Company, Anzalone has a substantial level of self-interest in the Company, and the outcome of any potential litigation.  Furthermore, Anzalone signed many of the misleading documents filed with SEC and was a speaker on the August 12, 2014 conference call, uttering the allegedly false statements, subjecting himself to liability for violations of the Securities Exchange Act.  Reasonable doubt exists regarding Anzalone's ability to be disinterested and independent in evaluating Plaintiff's demands.

69.     Defendant D. Given is Chairman of the Board.  In 2013 D. Given earned an annual salary of at least $31,875, and stock option awards of $52,023, for a total of $83,898.  Accordingly, D. Given has a vested interest in making sure the price of stock is as high as possible.  D. Given unloaded 2,000 shares of the company's stock in a transaction dated Friday, September 26, 2014, two weeks before the truth about ARC-520 was revealed on October 8, 2014.  D. Given's stock was sold at an average price of $15.24, for a total transaction of $30,480.00.  Following the completion of the sale, the director now directly owns 20,000 shares of the company's stock, valued at approximately $304,800.

70.     D. Given's brother, B. Given, was hired on October 26, 2012.  B. Given earned total compensation of $762,022 in 2013, and was awarded nearly $1 million in option awards in 2012 and 2013 combined.  B. Given is one of the speakers who made false and misleading statements on the August 12, 2014 conference call regarding the studies of ARCD-520.

71.     Furthermore, D. Given's position on the Board gives him a certain level of prestige in the business community.  Particularly in light of the fact that D. Given's brother is Chief Operating Officer of the Company and one of the speakers who communicated information alleged to be false, reasonable doubt

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

exists regarding D. Given's ability to be disinterested and independent in evaluating Plaintiff's demands.

72.     Defendant Frykman receives substantial compensation and stock options from the Company for his position.   Specifically, in 2013 Frykman earned an annual salary of at least $37,500 as well as $45,553 in stock options for a total of $83,053.  As Chair of the Audit Committee, Frykman also received a grant of an option to purchase 5,000 shares of common stock.  As of September 30, 2013, Frykman had outstanding option grants to purchase 82,500 shares at prices ranging from $2.01 to $20.20.  Accordingly, Frykman has a vested interest in making sure the price of stock is as high as possible.  Furthermore, Frykman's position on the Board gives him a certain level of prestige in the business community. Because Frykman has substantial self-interest in the Company, he cannot be considered independent in evaluating Plaintiff's demands.

73.     Defendant McKenney receives substantial compensation and stock options from the Company for his position. Specifically, in 2013 McKenney earned $37,500 in salary and $39,318 in stock options, for a total of $76,818. McKenney had outstanding option grants to purchase 75,000 shares at prices ranging from $2.19 to $20.20 as of September 30, 2013.   Accordingly, McKenney has a vested interest in making sure the price of stock is as high as possible. Furthermore, McKenney's position on the Board gives him a certain level of prestige in the business community. Because McKenney has substantial self-interest in the Company, he cannot be considered independent in evaluating Plaintiff's demands.

74.     Defendant Perry receives substantial compensation and stock options from the Company for his position. Specifically, in 2013 Perry earned $37,500 in salary and $45,552 in stock options, for a total of $83,053.  As Chair of the Compensation Committee, Perry also received a grant of an option to purchase 5,000 shares of common stock.  Perry had outstanding option grants to

-21-

purchase 77,000 shares at prices ranging from $2.01 to $5.19 as of September 30, 2013.  Accordingly, Perry has a vested interest in making sure the price of stock is as high as possible. Furthermore, Perry's position on the Board gives him a certain level of prestige in the business community. Because Perry has substantial self-interest in the Company, he cannot be considered independent in evaluating Plaintiff's demands.

75.     Defendant Ferrari declined to receive compensation in 2013. However, he held outstanding option grants to purchase 24,843 shares at prices ranging from $9.60 to $28.70.

76.     Thus, Arrowhead's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards.   These Defendants are also interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options. Because of this self-interest, demand upon such individuals would be futile.

a.     As members of the Board's Audit Committee, Defendants Frykman, McKenney, and Perry were responsible for reviewing the Company's financial statements and ensuring their accuracy and compliance with the law. This would have included the August 12, 2014 press release filed with the SEC on Form 8K.  Defendants Frykman, McKenney, and Perry wholly failed to exercise their fiduciary duties the Company in performing the functions required by the audit committee.   Accordingly, demand upon Frykman, McKenney, and Perry would be futile.

b.     Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein and in the securities class actions, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

c.     The entire Board and senior management participated in the wrongs complained of herein.  For the reasons described herein, the Company's directors are not disinterested or independent.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.  Each of the above referenced Defendants breached the fiduciary duties they owed to the Company and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements.  Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome since their actions have subjected the Company to millions of dollars in potential liability for violations of applicable securities laws;

d.     Each of the key directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile;

e.     The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

f.     In order to bring this suit, all of the Company's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

g.     The acts complained of constitute violations of the fiduciary duties owed by the Company's officers and directors and these acts are incapable of ratification;

h.     Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of various of the false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it;

i. Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and the Company to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, the Individual Defendants are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

j. The Company has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages that the Company suffered and will suffer thereby; and

k. If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in a class action complaint for violations of securities law, which admissions would impair their defense of the class action and greatly increase the probability of their personal liability in the class action, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. Thus, the Individual Defendants would be forced to take positions contrary to the defenses they will likely assert in the securities class action.

l. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for the Company for any of the wrongdoing alleged by Plaintiff herein.

/////

-24-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

77.    Plaintiff, moreover, has not made any demand on shareholders of the Company to institute this action since demand would be a futile and useless act for the following reasons:

a.    The Company is publicly held, with 52 million shares outstanding and thousands of shareholders;

b.    Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of determining the names, addresses, or phone numbers of shareholders; and,

c.    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

Furthermore, the conduct alleged herein could not have been the product of good faith business judgment, and each of the Individual Defendants faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected the Company to substantial damages.  Furthermore, the conduct of the Individual Defendants has subjected the Company to potential liability in connection with securities fraud class actions.  Through their intentional misconduct, the Individual Defendants have subjected the Company to potential costs, fines, and judgments associated with the securities class action.  Such actions by the Individual Defendants cannot be protected by the business judgment rule.  Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

**COUNT I**
**(AGAINST THE INIDIVUAL DEFENDANTS FOR BREACH OF FIDUCIARY DURY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION)**

78.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.    This First Claim is asserted against all Defendants.

/////

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

80.    The Individual Defendants owed a fiduciary duty to the Company to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and that such filings conformed to applicable securities laws.  The Individual Defendants, however, breached their fiduciary duties by allowing the Company to issue and disseminate misleading statements and filings.

81.    As members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein.  Each of the Individual Defendants had knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.   The alleged acts of wrongdoing have subjected the Company to unreasonable risks of losses and expenses.

82.    Each of the Individual Defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company.   As a result of the Individual Defendants' breaches, the Company's reputation in the business community and financial markets has been irreparably tarnished.

**COUNT II**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO OVERSEE AND MANAGE THE COMPANY PROPERLY)**

83.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

/////

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

84.     This Second Claim is asserted against each of the Individual Defendants.

85.     The Individual Defendants owed the Company fiduciary obligations. By reason of such fiduciary obligations, the Individual Defendants specifically owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care, reasonable inquiry, oversight, and supervision.

86.     The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision by engaging in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that the Company complied with applicable laws, rules, and regulations.  As a direct and proximate result of the Individual Defendants' failure to adequately perform their fiduciary obligations, the Company has sustained significant damages monetarily and injury to its corporate image and goodwill.

87.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  Plaintiff, moreover, has no adequate remedy at law.

**COUNT III**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT)**

88.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.     The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.  The Individual Defendants, however, by their actions, and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.  By committing the

-27-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

90.     During the course of the discharge of their duties, the Individual Defendants were aware of the unreasonable risks and losses associated with their misconduct.   Nevertheless, the Individual Defendants caused the Company to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.   As a result, the Individual Defendants grossly mismanaged the Company, thereby causing damage to the Company.

**COUNT IV**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR**
**CONTRIBUTION AND INDEMNIFICATION)**

91.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.     The Company is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to Defendants' liability to the Company. The Company's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants, and the Company is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are, or may in the future be asserted against the Company by virtue of the Individual Defendants' misconduct.

**COUNT V**
**(AGAINST THE INDIVIDUAL DEFENDANTS**
**FOR ABUSE OF CONTROL)**

93.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

94.     The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over the Company.

95.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

**COUNT VI**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR**
**WASTE OF CORPORATE ASSETS)**

96.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

97.     The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of the Company.

98.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment as follows:

i.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

ii.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

iii.    Granting such other and further relief as the Court deems just and proper.

/////
/////

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

00089852.000.doc

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURY DEMAND**

Plaintiff demands a trial by jury.


DATED:  November 20, 2014          **GREEN & NOBLIN, P.C.**



By: ___*s/ Lesley E. Weaver*___
        Lesley E. Weaver

Robert S. Green
James Robert Noblin
700 Larkspur Landing Circle, Suite 275
Larkspur, CA  94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710

Attorneys for Plaintiff

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

00089852.000.doc

## VERIFICATION

STATE OF Maryland )
                              )
COUNTY OF Baltimore )
                              )

     I, Harvey Weisman declare that I have reviewed the Complaint ("Complaint") prepared on behalf of Arrowhead Research Corporation [NasdaqGS: ARWR] and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder of 300 Arrowhead Research Corporation shares, and have been a holder of ARWR common stock since June 19, 2014, and have held such stock during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_____11/12/14_____
**Date**

                                                                                                              
Harvey Weisman